## Commonwealth v. Weatherby

*Gerald D. Prather*, for Commonwealth.

*Robert L. Walker*, for defendant.

Mook, P. J., April 23, 1955.—Defendant was arrested before a justice of the peace upon an information filed by an officer of the Pennsylvania State Fish Commission charging that the said defendant "on

the 24th day of July, 1954, wilfully, maliciously and unlawfully did operate a Motor Boat on Pymatuning Dam with a motor in excess of 6 H.P. as certified by the Manufacturer. Being a Scott Atwater 7.5 Horse Power . . . contrary to this Act No. 125 Rules and Regulations as amended".

After a hearing, defendant was found guilty by the justice of the peace and sentenced to pay a fine of $50 and the costs of prosecution. Within five days thereafter, defendant filed a petition for allowance of appeal to this court which was granted. In lieu of a hearing, the counsel for the Commonwealth and defendant filed a stipulation of the material facts and the case was argued before the court solely on questions of law.

The facts as stipulated are as follows:

"1. That on or about July 24, 1954, defendant, Frank C. Weatherby was operating a Scott Atwater outboard motor on Pymatuning Reservoir, said motor being serial no. 333875, license no. 16638 and said motor being rated by the manufacturer as a 7.5 horsepower motor, and said motor according to the manufacturer's specifications has a bore diameter of 2″, a length of stroke of 1¾″, produces a maximum of 4,200 revolutions per minute and is a two cylinder motor;

"2. The said motor was properly licensed by the Department of Revenue of the Commonwealth of Pennsylvania with a motor boat license;

"3. That said motor was equipped with a stop or governor so affixed to the motor that said motor would not develop over six horsepower without the removal of said stop or governor;

"4. That said stop or governor was affixed sometime during 1953 in accordance with the practice acquiesced in by the Department of Forest and Water on Pymatuning Reservoir and properly sealed with a lead seal and that said seal had not been broken or tampered with;

"5.* That at the aforesaid time and place, defendant, Frank C. Weatherby, was arrested by a patrolman in the employ of the Department of Forests and Waters of the Commonwealth of Pennsylvania and charged with a violation of the rules and regulations regarding Pymatuning Lake."

Defendant's first contention is that, under the facts as stipulated, he is not guilty of the crime charged, and second, that the act of assembly under which defendant was charged applies only to inland waters and, therefore, confers no jurisdiction upon the Fish Commission over Pymatuning Lake.

We are indebted to defendant's counsel for an able and comprehensive brief, and since this appeal demonstrates the need for clarification of the laws relating to Pymatuning Lake, we will set forth at least a part of the historical background of the lake and the laws and regulations pertaining thereto, given to us by defendant's counsel from his wide knowledge of the subject.

Pymatuning Lake is an artificially created body of water which came into existence through the erection of a dam and reservoir under the auspices of the Commonwealth of Pennsylvania. In 1911 the legislature authorized a survey of Pymatuning Swamp and an examination into the feasibility of constructing a reservoir therein to conserve waters draining into the swamp. The plan was found to be feasible, so on July 25, 1913, an act was passed (no. 781, P. L. 1270) authorizing the Water Supply Commission of Pennsylvania to cause a dam to be constructed across the outlet to Pymatuning Swamp for the purpose of establishing a reservoir and of conserving the water entering said swamp and regulating the flow of water in the Shenango and Beaver Rivers. The preamble to this act stated:

---

* This is not in accordance with the complaint.

"Whereas, In said report the Water Supply Commission states that the project is a feasible one, that a portion of said Pymatuning Swamp can be converted into a storage reservoir by constructing a dam across the valley of the Shenango river, that the low water flow in the Shenango river would thereby be increased about two hundred seventy-five million gallons per diem, that the reservoir would eliminate any considerable contribution to floods from the territory above the dam, that the proposed reservoir would improve the sanitary conditions of the Shenango and Beaver rivers and of the swamp, that approximately two thousand primary horse-power would be added to existing water power in the Beaver river, that the construction of the dam and reservoir would cause a benefit along the Shenango and Beaver valleys more than commensurate the cost of the project, that the industrial development would be increased, and that the communities in the vicinity of the reservoir would be benefited through improved highways, the creation of an attractive lake, increased water transportation, and better sanitary conditions; therefore."

Pursuant to this and further statutory authority the dam was built and the reservoir constructed, thereby establishing a body of water covering more than 16,000 acres of land in the area including a considerable part of several townships in Western Crawford County, Pa., and eastern Ohio.

Mr. Walker in his brief states that since the creation of the reservoir there has been opposition by various factions to the development of the reservoir and surrounding land as a recreational area. One of the chief reasons for this opposition has been the fear that the development of the reservoir as a recreational area might overshadow the primary purpose of the reservoir, that is, to conserve water and maintain a steady supply of water for the industries in the Shenango and

Beaver Valleys. As a result of this, the Act of May 2, 1929, P. L. 1530, 32 PS §763 was enacted. '

This act, after providing for the completion of the dam by the Department of Forests and Waters through the Water and Power Resources Board, authorized the development of the reservoir and surrounding lands for fishing, hunting, game refuges, recreation park or other purposes, provided, however, that such uses will not in the opinion of the board interfere with the primary purpose of the reservoir in conserving the water entering Pymatuning Swamp and regulating the flow in the Shenango and Beaver Rivers.

It was further provided in this act that "The Water and Power Resources Board is vested with complete and final authority concerning the use and development of the land and water comprised within the Pymatuning Reservoir project, and the maintenance and operation of said project, and shall have authority to adopt and establish rules and regulations for the control, management, protection, development, and utilization of such land and water".

Thus the legislature vested in this board full, complete and exclusive power and authority to make rules and regulations concerning the operation and control of the lake and surrounding lands.

Nothing was done with reference to motor boating until 1936, and up until 1937 motor boats were used on the lake without restriction. On October 28, 1936, the Commonwealth of Pennsylvania, acting through the Water and Power Resources Board entered into a compact with the State of Ohio through its conservation division relative to the development, use and regulation of Pymatuning Lake and State-owned lands surrounding the lake for fishing, hunting, recreational and park purposes, which compact was ratified by an act of the Pennsylvania Legislature approved June 5, 1937, P. L. 1664, 71 PS §1840, and further ratified

by the Ohio Legislature and by act of Congress of the United States on August 28, 1937, c. 869, 50 Stat. at L. 865.

In the preamble of this act, the original purposes of the reservoir were restated as follows:

"Whereas, The primary purposes of the project by which said lake was created was to conserve water draining said swamp all of which has its source in Pennsylvania as well as control floods and regulate the flow of water in the Shenango and Beaver Rivers, the secondary thereto, permit the water and the land surrounding the same to be used for fishing, hunting, recreational, and park purposes, under such terms and conditions as the Water and Power Resources Board might determine, in such way or ways as, in the opinion of the said board, will not materially interfere with the primary purpose in said acts of Assembly and hereinbefore specially referred to;"

Thereafter the compact proceeds to state that the lake, subject to its primary use, "shall be open for recreational use equally to citizens of both contracting parties save as restricted as to hunting, fishing, and boating in this agreement set forth or hereafter mutually agreed upon by both parties, but no person shall be permitted to hunt or fish therein or thereon unless the lawful holder of a fishing or hunting license authorizing him or her so to do issued by the proper authorities of Pennsylvania or of Ohio".

The compact further states:

"That each state shall enjoy and exercise a concurrent jurisdiction upon the water (but not upon the dry land) between the shores of said lake, including the islands therein, with respect to the arrest and prosecution of offenders, but in such sort that any boat or vessel fastened to or aground on the shore of either state shall be considered exclusively within the juris-

diction of said state, but that all capital and other offenses, trespasses or damages committed on or over said lake, the judicial investigation and determination thereof shall be exclusively vested in the state wherein the offender or person charged with such offense shall be first apprehended, arrested, prosecuted, or first brought to trial, it being the intent of this agreement that an offender may be pursued and arrested anywhere on or over said lake or shores thereof or island therein, regardless of the boundary line, by any peace officers or persons of either state authorized to make arrests, whether the offenses be committed on or over any part of the lake, on the shores or islands therein, regardless of the state in which the place where the offense was committed lies."

The obvious intent of this section of the compact is to extend equal jurisdiction to each State for the prosecution of offenders under the existing laws of the Commonwealth of Pennsylvania and the State of Ohio.

But there was no existing legislation governing the operation of motor boats or any other type of vessels on Pymatuning Lake as was the case of the Delaware River Act of May 9, 1913, P. L. 185, secs. 1 and 2, 55 PS §§401, 402; hence, certain regulations were inserted in the compact itself one of which provides as follows:

"Boats and Vessels.

"No power or motor boats, nor hydroplanes or aquaplanes, shall be permitted anywhere on said lake, except such police or administration motorboats, to the number which shall be mutually agreed upon by the parties hereto. Sail boats, row boats, and canoes shall be permitted provided they first obtain a license from the respective state of which the owner is a resident under such regulations as each party to this agreement may now have or hereafter adopt."

However, no penal clause was included in the compact nor in any other legislation for the purpose of enforcing this regulation, as was the case in the Delaware River act previously referred to. Nonetheless, following the adoption of the Act of 1937 ratifying the compact, no motor boats at all were allowed on the lake until 1945 when the Act of 1937 was amended by the Act of April 20, 1945, P. L. 282, which amended the aforesaid paragraph 5 of the compact as follows:

"(5) Boats and Vessels.

"No hydroplanes or aquaplanes nor any type of boat equipped with a motor in excess of six horsepower rating shall be permitted anywhere on said lake, except such police or administration motorboats, to the number which shall be mutually agreed upon by the parties hereto. Sailboats, rowboats, canoes, and boats equipped with a motor not in excess of six horsepower shall be permitted, provided the owners first obtain a license from the respective state of which the owner is a resident under such regulations as each party to this agreement may now have or hereafter adopt: provided, nevertheless, That the use of any type of boats equipped with a motor not in excess of six horsepower, as defined above, is expressly limited and restricted to that portion of the lake extending from the main dam near Jamestown northwardly to the Causeway at or near Espyville."

This amendment was also ratified by the Legislature of the State of Ohio and by Act of Congress of the United States July 24, 1954.

This amendment of 1945 apparently is the act no. 125 referred to in the complaint filed in the above entitled case and which defendant is charged with violating. Here again there is no penal clause contained in the statute and the question, therefore, presents itself as to how this defendant can be convicted of a crime and

sentenced to pay a fine in the absence of any penal provision.

Before discussing the question, however, we wish to briefly refer to defendant's first contention that the motor boat operated by him does not violate the provision of the law as it now stands.

As Mr. Walker says in his brief, ever since the passage of the 1945 amendment, the construction of the words "6 horsepower rating" has been open to dispute, and the Commonwealth has adopted three different interpretations of these words, each of which is in conflict with the other. These changes in interpretations were not due to any changes in legislation or any court decisions but were made solely by administrative officials of the State Government.

The question first came before the State officials in the spring of 1947. At that time the Department of Forests and Waters requested an interpretation from the Department of Justice of the Commonwealth of Pennsylvania in regard to this question, and the department ruled that horsepower as used in the act could only mean horsepower as it had been defined by statute in Pennsylvania and that the only statute defining horsepower was the Act of May 1, 1929, P. L. 905, sec. 403, 75 PS §93, which is a portion of The Vehicle Code and reads as follows:

"The horsepower of motor vehicles, except those propelled by steam or electricity, shall be computed by the following formula: Diameter of bore in inches, squared, times the number of cylinders, times fourtenths (.4)."

The reasoning of the Department of Justice is set forth in a letter from Mr. Ralph B. Umsted, then a Deputy Attorney General to the Hon. Milo F. Draemel, who was then Secretary of Forests and Waters under date of May 21, 1947, which letter was as follows:

"COMMONWEALTH OF PENNSYLVANIA
"DEPARTMENT OF JUSTICE
· "HARRISBURG

May 21, 1947

"Honorable Milo F. Draemel
"Secretary of Forests and Waters
"Harrisburg, Pennsylvania
"Dear Admiral Draemel:

"Under date of May 20, 1947, you inquired if boats equipped with Martin '60' outboard motors, manufactured by the Martin Motors Division of National Pressure Cooker Company, Eau Clair, Wisconsin, may be lawfully operated upon Lake Pymatuning.

"The motor referred to is advertised: Two cylinder with two inch bore, O. B. C., certified brake horsepower at 4000 R. P. M., 7.2. This means that at 4000 revolutions a minute the motor develops 7.2 horsepower.

"Under the Act of June 5, 1937, P. L. 1664, as amended by the Act of April 20, 1945, P. L. 282, 71 P. S. Section 1840, 'Boats equipped with a motor not in excess of six horsepower' are permitted to operate upon limited portions of Lake Pymatuning. But it is obvious that the six horsepower refers not to developed horsepower, but to computed horsepower. For Section 403 of the Motor Vehicle Code, The Act of May 1, 1929, P. L. 905, 75 P. S. Section 93, provides for the calculation of the horsepower of motor vehicles propelled by gasoline according to the following formula: 'Diameter of bore in inches, squared, times the number of cylinders, times four-tenths, (.4).'

"The motor in question, having two cylinders with a bore of two inches, an application of the formula, 2 squared times 2 times .4, gives a computed horsepower of 3.2.

"Boats equipped with such motors may lawfully be operated upon the portions of Lake Pymatuning de-

scribed in the Act of June 5, 1937, P. L. 1664, as amended by the Act of April 20, 1945, P. L. 282, 71 P. S. Section 1840.

"Yours truly,
"/s/ RALPH B. UMSTED
"Ralph B. Umsted
"Deputy Attorney General."

It will be noted from this letter that the motor under question at that time was a motor with a manufacturer's rating of 7.2 horsepower but with a rating computed under the statutory formula of a 3.2 horsepower and the Department of Justice ruled that such a motor could lawfully be operated upon Pymatuning Lake. In 1948 the department evidently became dissatisfied with this situation and again requested an opinion from the Attorney General's department after consultation with officials in the State of Ohio. Mr. Umsted, the same Deputy Attorney General, who had written the previous opinion addressed another letter to Admiral Draemel, dated March 17, 1948, in which he reversed his position on the basis that that formula that he had previously cited did not take into consideration the fact that, as Mr. Umsted states, outboard motors are two cycle motors. This letter is as follows:

"DEPARTMENT OF JUSTICE
"Harrisburg

March 17, 1948

"Honorable Milo F. Draemel,
"Secretary of Forests and Waters,
"Harrisburg, Pennsylvania.
"Dear Admiral Draemel:

"Please refer to my letter to you of May 21, 1947, concerning the method of computing horsepower for outboard motors used on boats operating on the unrestricted portions of Lake Pymatuning.

"In that letter I gave you the formula set forth in Section 403 of the Motor Vehicle Code, the Act of May

1, 1929, P. L. 905, 75 P. S. Section 93, 'Diameter of bore in inches, squared, times the number of cylinders, times four-tenths (.4)', but unfortunately I did not take into consideration the engineering fact that this formula apparently is applicable to four cycle and not two cycle motors. Outboard motors are two cycle motors.

"After conference with officials of the State of Ohio, it was concluded that regulations be adopted by the States of Ohio and Pennsylvania defining exactly the method of computing horsepower for outboard motors used on Lake Pymatuning, in order to determine which motors will come within or without the restricted six horsepower provided for in the Act of June 5, 1937, P. L. 1664, as amended by the Act of April 20, 1945, P. L. 282, 71 P. S. Section 1840. This appears necessary because as heretofore explained the formula set forth in the Motor Vehicle Code is not applicable.

"Disregard, therefore, my letter to you of May 12, 1947, and be advised that you may properly adopt a regulation concerning this matter. In accordance with this view I have drafted form of regulation which I submit to you for adoption if you are thus disposed. The State of Ohio will be satisfied with this as written.

"Please let me know what action you have taken in this matter, so that I can communicate it to the Attorney General of the State of Ohio.

> "Yours very truly,
> "/s/Ralph B. Umsted
> "Ralph B. Umsted
> "Deputy Attorney General."

Commenting on this letter, Mr. Walker in his brief says:

"It is to be noted that Mr. Umstead's reversal of his position was based on the fact that outboard motors are two cycle motors and that the formula, *'apparently*

is applicable to four cycle and not two cycle motors.' It might be noted in passing that assuming that Mr. Umstead is correct in stating that this formula should only be applied to four cycle motors, outboard motors come in both two cycle and four cycle motors and therefore if the formula is still applicable to four cycle motors there are many outboard motors of the four cycle variety which would not come within the opinion of March 17, 1948. However, in the instant cases both of the motors involved are two cycle motors and therefore that particular question is moot insofar as these proceedings are concerned.

"As a matter of engineering fact, however, there is no logical reason for differentiating between four cycle and two cycle motors in applying any given formula to determine horsepower. We therefore submit that this reversal of opinion was based upon a false premise."

Mr. Walker further states that:

"After the reversal of the Department's position in 1948 it became the prevailing practice to place what was known as a stop or governor on outboard motors of more than six horsepower manufacturer's rating, the stop being so adjusted that the motor could only develop a certain number of revolutions per minute and would therefore be limited to a development of six horsepower. In other words, the motors, after being equipped with a stop could not develop over six horsepower without the removal of the stop or governor. This general practice was at least tacitly approved or acquiesced in by the department until early in the spring of 1953, when Mr. Samuel Lewis, present Secretary of the Department of Forests and Waters, issued a directive that the state would no longer acquiesce in this practice and that henceforth only motors with a six horsepower manufacturer's rating or less would be usable on Pymatuning Lake."

Meanwhile a great many people who used the recreational facilities of Pymatuning Lake had purchased motors with higher horsepower and the pressure was put on the Secretary of Forests and Waters to again change the interpretations of the 1945 amendment. Mr. Samuel Lewis, who had succeeded Admiral Draemel as secretary of the Department of Forests and Waters, apparently yielded to the pressure because after some consultation he issued directions that it would be lawful to use a stop or governor provided it was put on the motor in accordance with the department's regulations and provided it was so sealed with a lead seal that any tampering or removal of the stop would be easily detectable. On this basis, motor boats were operated on Pymatuning Lake during 1953.

In connection with this last ruling, the department issued a new formula under which the number of revolutions per minute at which the motor was to be stopped to develop a given horsepower was set forth as follows: Number of cylinders times the diameter of the bore squared, times the length of the stroke, times the number of revolutions per minute, divided by 9,000, equals the developed horsepower of the motor. It was on the basis of this formula and dynamometer tests that the stops were placed on the motors of the defendants in these cases.

This ruling remained in effect until the early spring of 1954 when Mr. Lewis again reversed himself and ruled that the department was going to rely strictly upon the manufacturer's rating of horsepower and that stops would not be allowed. (The same ruling as has recently been issued by the new secretary of Forests and Waters, Mr. Maurice K. Goddard.)

Since the facts stipulated elsewhere in this case establish that defendant was operating a motor boat equipped with a stop or governor so affixed that the motor would not develop over six horsepower without

the removal of said stop or governor and sealed with a lead seal which had not been broken or tampered with, defendant argues that he is not guilty.

As Mr. Walker states in his brief, it is a matter for the courts to decide what the legislature meant when it used the words "six horsepower rating" in the Act of 1945. He then invokes the Statutory Construction Act of May 28, 1937, P. L. 1019, art. 4, sec. 51, 46 PS §551 and attention is particularly called to the third paragraph of this section which provides:

"When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters—(1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law."

Defendant then argues at length that the former construction of the law adopted by Admiral Draemel, the Secretary of Forests and Waters at the time of the 1945 amendment and later concurred in by Secretary Lewis should be retained; he further argues that provisions of The Vehicle Code defining horsepower should be adopted and that the consequences of the strict enforcement of the law as now interpreted are unfair, harsh and burdensome to the many persons who were lulled into a sense of security by the former interpretations placed thereon by the administrative officials and purchased motors of greater horsepower than six.

All of these arguments, in our opinion, overlook the first two paragraphs of the Statutory Construction Act of 1937 which provide:

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. Every law shall be construed, if possible, to give effect to all its provisions.

"When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."

It seems to us that the esteemed Admiral Draemel and his successor Mr. Lewis went completely beyond their authority in attempting to place entirely unwarranted interpretations upon a provision of the law which we think is plain and free from ambiguity. In other words, when the legislature said that "No hydroplanes or aquaplanes nor any type of boat equipped with a motor in excess of a six horsepower rating shall be permitted anywhere on said lake", it meant exactly what it said and could not mean anything else except the rating placed on the motors by the manufacturers. Certainly, the legislature never contemplated that the enforcement officers would have to take an engineer along with them to make an examination of the intricacies of every motor boat on the lake in order to determine whether or not the horsepower exceeded that permitted by the statute.

Defendant argues that the manufacturer's "rating is inaccurate for the reason that it is not based on any scientific calculation but is purely an advertising figure." He points out that no one has control over what the manufacturer desires to rate his motor and if this construction was followed to its logical conclusion, the manufacturer could rate a motor which would actually develop 10 horsepower as a six horsepower motor and sell it for legal use on Pymatuning. We submit, however, that this mischief is a matter for legislative correction and not judicial interpolation. So long as the legislature prohibits the use of motor boats in excess of a six horsepower rating, what busi-

ness is it of the courts to say that we won't adopt the rating but will use some other figure in concluding the horsepower of any given motor? We, therefore, reject the defendant's first contention that the law was not violated by the defendant in this case.

We now return to what we think is a more serious problem in this case and that is how the Commonwealth proposes to enforce this provision of the Act of 1945, or for that matter any of the rules and regulations issued thereunder, in the absence of a penal statute providing for such enforcement?

This problem evidently became a matter of concern to the Water and Power Resources Board when the amendment was enacted, for in 1945, the board requested an opinion from the Department of Justice pertaining to the licensing of boats equipped with motors for operation on Pymatuning Lake. In response to the request of the chairman of the board, the Attorney General submitted an opinion, which is set forth in full as an appendix to this opinion, wherein the board was advised that the Act of May 28, 1931, P. L. 202, as last amended by the Act of June 21, 1937, P. L. 1984, 55 PS §485, entitled "Motor Boats on Inland Waters" applied to Pymatuning Lake.

There is no provision in the act whatsoever relating to the use of motor boats on Pymatuning Lake such as is contained in the Pennsylvania-Ohio Compact of 1936, which was adopted by the Pennsylvania Legislature in 1937 and amended in 1945. On the contrary, this act was designed only to regulate the use of motor boats on "inland waters" which are defined in the act itself as being "Any public stream, river, lake, artificial or natural body of water within the Commonwealth". It is further provided that the enforcement of this statute shall be under the jurisdiction of the Board of Fish Commissioners of the Commonwealth and that

board is authorized and empowered to prescribe, promulgate and enforce:

"(a) General rules and regulations to be observed in the operation or navigation of motor boats upon, over, or through inland waters which it shall deem necessary for the public health or the safety of persons or property on or in such waters, or for the preservation of all forms of useful aquatic life, particularly as to speed, running, lights, signals, courses, channels, rights-of-way, and the disposal of oil, gas, gasoline, or other wastes from such boats.

"(b) Special rules and regulations for such particular, artificial or natural areas of waters, for further limiting or restricting or prohibiting the operation or navigation of motor boats thereon to protect the public health, or to protect and preserve useful aquatic life."

It is to be noted that the foregoing sections were contained in the original act of 1931 and last amended by the Act of May 31, 1933, P. L. 1122, which was before the adoption of the Pennsylvania-Ohio Compact of 1936.

The 1931 Motor Boat Law and its amendments also contain a penal clause, 55 PS §490, which provides:

"Any person violating any provision of this act, or any rule or regulation prescribed by the board under this act, shall, upon conviction thereof in a summary proceeding before a justice of the peace, alderman or magistrate, be sentenced to pay a fine of not less than five dollars and costs, nor more than one hundred dollars and costs, or, in default of payment thereof, thirty days in jail; and, in addition, the Department of Revenue may revoke the license issued for the motor boat used by such person."

The Commonwealth now contends that this penal clause applies to violations of the rules and regulations issued by the Department of Forests and Waters which

now have been adopted and made a part of the rules and regulations of the Board of Fish Commissioners regulating the use of motor boats on Pymatuning Lake and the sentence imposed by the justice of the peace upon the defendant in this case was entered under the provisions of this section.

In order to make this act apply to Pymatuning Lake, the Attorney General had to come to the conclusion that the lake was an inland water and he so advised the Department of Forests and Waters in his opinion of 1945 hereinabove referred to, as reference to the opinion will indicate. The opinion states:

" 'Inland waters' are defined as 'any public stream, river, lake, artificial or natural body of water within the Commonwealth'. Pymatuning Lake is a boundary lake between the Commonwealth of Pennsylvania and the State of Ohio and is in our opinion an inland water within the above definition.

"Were we to conclude this question otherwise, we would be obliged to supply in the foregoing definition after the noun 'water' and before the preposition 'within', the adverb 'wholly'. This we cannot do in the face of legislative evidence which clearly indicates that when the Legislature intends to exclude from the application of any part of the law a lake wholly within the confines of Pennsylvania, it has no difficulty in expressing that purpose with the utmost clarity. An example of this is found in the Fish Law of May 2, 1925, P. L. 448. Section 60 of that act as amended by the Act of July 12, 1935, P. L. 1145, 30 P. S. Section 60, specifically defines 'boundary lake', and Section 90 makes certain provisions for licenses which are applicable to fishing only in such bodies of water.

"It follows that had the Legislature intended to exclude boundary lakes from the application of the Act of 1931, as amended, it would not have used the all inclusive phraseolgy 'any . . . lake . . . within the

Commonwealth', or it would have qualified the word 'lake' by an expression such as, except boundary lakes."

The difficulty with the Attorney General's opinion is that in our judgment it is directly contrary to the facts. Pymatuning Lake does not lie within the Commonwealth of Pennsylvania, but on the contrary, almost half of the lake is in the State of Ohio. The Attorney General admits in the first paragraph quoted above that the lake is a boundary lake between the State of Pennsylvania and the State of Ohio. Had the legislature intended to include Pymatuning Lake within the scope of the Act of 1931 it could have easily said so by including regulations for boundary lakes as was done when it adopted The Fish Law of May 2, 1925, P. L. 448, sec. 1, 30 PS §1. In that act, certain provisions contained in chapter II were construed to apply to waters wholly within the boundaries of the Commonwealth and certain other provisions contained in chapter III were enacted which applied to boundary lakes. In that chapter "boundary lake" was defined as follows:

" 'Boundary lake' means such part or parts of lakes of more than five thousand acres lying between this and any other State or foreign country as this Commonwealth has jurisdiction over."

While the evidence does not show the size of Pymatuning Lake, we think we can take judicial notice of the geographic location in our own county and the facts are that Pymatuning Lake covers more than 16,-000 acres, and as already has been said, lies between the Commonwealth of Pennsylvania and the State of Ohio.

The Board of Fish Commissioners has long recognized that Pymatuning Lake is a boundary lake. We had before us certain other proceedings involving this question in juvenile court which were later withdrawn

and rules and regulations were issued by the Board of Fish Commissioners for the operation of motor boats on island waters and Pymatuning Lake. These rules were headed by the following paragraph:

"In compliance with and under the authority of Act 121 approved May 28, 1931, and amendments thereto, the following rules and regulations are hereby prescribed for the operation and equipment of all motor boats operated on any public waters within the State of Pennsylvania, and Pymatuning Lake, which is a boundary lake between the States of Pennsylvania and Ohio, for the year ending March 31, 1950."

The rules and regulations pertaining to Pymatuning Lake were entitled special regulations but we do not know whether it was the thought of the board that these regulations could be promulgated by it under the provisions of subparagraph (b) of section 2 of the Act of May 31, 1933, P. L. 1122, hereinabove quoted wherein the legislature provided for special rules and regulations "for such particular, artificial or natural areas of waters". In our judgment, however, this paragraph could not by any stretch of the imagination apply to Pymatuning Lake but rather applies to the latter part of the definition of inland waters as being "Any public stream, river, lake, artificial or natural body of water within the Commonwealth". As we have mentioned, this section was enacted prior to the Pennsylvania-Ohio Compact of 1936.

The Board of Fish Commissioners has now issued a new set of rules and regulations for Pymatuning Lake which are word for word the rules and regulations issued by the Department of Forests and Waters on September 12, 1945. These rules were adopted by the Fish Commission at its meeting held on October 5, 1953, for the period beginning April 1, 1954, to March 31, 1955. The rules state:

"The rules and regulations governing the operation of motor boats on Pymatuning Lake were set up by the Department of Forests and Waters and adopted by the Pennsylvania Fish Commission."

And section 1 of the rules and regulations provides that "No hydroplanes or aquaplanes, nor any type of boat equipped with a motor in excess of six horsepower rating, shall be permitted anywhere on the Pymatuning Lake."

As we have already pointed out, the penal clause of the Motor Boat Act of 1931, as amended, provides that: "Any person violating any provision of this act, or any rule or regulation prescribed by the board under this act, shall, upon conviction thereof in a summary proceeding before a Justice of the Peace . . . be sentenced to pay a fine of not less than five dollars and costs, nor more than one hundred dollars and costs."

The Commonwealth, therefore, says defendant has violated a rule and regulation issued under this act and was, therefore, properly convicted. But the rule and regulation violated could not be prescribed under this act because the act applies only to inland waters and Pymatuning Lake is not an inland water, but on the contrary is clearly and obviously a boundary lake. Moreover, defendant is not charged with the violation of this law but, on the contrary, as we have already pointed out, is charged with the violation of act no. 125 which is the amendment to the Pennsylvania-Ohio Compact and, in our opinion, the Board of Fish Commissioners cannot lift the penal clause out of the 1931 Motor Boat Law and make it apply to the 1945 amendment to the compact entered into between the Commonwealth of Pennsylvania and the State of Ohio.

It is unfortunate that the effect of this decision will be to render ineffective the attempts of the Board of Fish Commissioners to control motor boats upon Pymatuning Lake, but we do respectfully call the board's

attention to the fact that under the Act of 1929 which provided for the completion of the reservoir and dam that the Water and Power Resources Board was vested with complete and final authority concerning the use and development of the land and waters and maintenance and operation of said project and when the compact between Pennsylvania and Ohio was entered into in 1936, it was agreed that the entire lake "shall be open for recreational use equally to citizens of both contracting parties save as restricted as to hunting, fishing, and boating in this agreement set forth or hereafter mutually agreed upon by both parties". We think that this means that the control of motor boats upon Pymatuning Lake was to be determined by agreement between both States and while that particular agreement did prohibit the use of motor boats on the lake, it did not make the use a crime or provide any penalty therefor. We do not know whether this omission was intentional or not, but, if not, it can and should be corrected now. In any event, we are of the opinion that the Commonwealth of Pennsylvania cannot enforce the provisions of this compact through the imposition of a penalty provided for in an act that, by its own terms, applies only to inland waters, and since there is no penal clause in the amendment of 1945, the act under which defendant in this case is charged, the conviction and sentence cannot stand. "Since no common law crime is involved no penalty can be imposed by the court unless the statute itself provides such a penalty": Commonwealth ex rel. Varronne v. Cunningham et al., 365 Pa. 68, 71.

Therefore, we enter the following

*Order*

And now, April 23, 1955, defendant is discharged and the County of Crawford is ordered to pay the costs of this case.